Martin F. Schubert (admitted *pro hac vice*)
STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
mschubert@stranchlaw.com

Todd Amick, Esq ISB: 5534
AMICK LAW OFFICES, PLLC
3367 S. Glen Falls Place
Boise, Idaho 83706
Telephone: (208) 580-4404
Todd@AmickLawOffices.com

*Attorneys for Plaintiff and the Putative Class*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ERIN TUCKER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FRONTIER CREDIT UNION,<br><br>Defendant. | Case No. 4:26-cv-00120-BLW<br><br>**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff, Erin Tucker, individually and on behalf of the Class of persons preliminarily defined below, makes the following allegations based upon information and belief, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

**NATURE OF THE ACTION**

1.      Plaintiff brings this lawsuit against Defendant on behalf of herself and all others similarly situated on the basis that Defendant Frontier Credit Union has violated the Electronic Fund Transfer Act, 15 U.S.C. § 1693, *et seq.* ("EFTA"), and Regulation E thereto, 12 C.F.R. §

1

1005.1, *et seq*. ("Regulation E"), and Defendant has economically harmed Plaintiff and its other customers through the use of deceptive, unclear, and ambiguous language which fails to notify its customers of Defendant's true overdraft fee practices and accordingly fails to provide customers like Plaintiff and the putative Class with the ability to plan their finances effectively to avoid these onerous fees.

2.   Regulation E requires that, before a financial institution may charge overdraft fees ("OD Fees") on one-time debit card and ATM transactions, it must obtain the consumer's affirmative consent to participate in the overdraft service. In order to do so, financial institutions must provide customers with a complete, clear, and easily understandable disclosure document that accurately describes its overdraft services (the opt-in disclosure agreement). The opt-in disclosure document must be substantially similar to Regulation E Model Form A-9 and presented to customers as a stand-alone document not intertwined with other disclosures. The financial institution must then obtain the customer's verifiable agreement to opt-in to the financial institution's overdraft program, regardless of the method of opt-in (i.e., in person at a branch, online, or by phone), only after which may it begin assessing overdraft fees on one-time debit card or ATM transactions.

3.   Defendant provides its accountholders with an Overdraft Opt-In disclosure agreement ("Opt-In Form"), attached hereto as **Exhibit A**

4.   Defendant's Opt-In Form fails to provide a clear and unambiguous description of when its accountholders can expect to be assessed overdraft fees in clear violation of the requirements of the EFTA and Regulation E.

5.   Defendant's Opt-In Form also improperly relies on language included in separate contract documents to provide a description of Defendant's OD Fee practices that accountholders

were asked to opt in to. As such, Defendant failed to present its opt-in disclosure agreement in a manner that is "segregated from all other information," as Regulation E requires. 12 C.F.R. § 1005.17(b)(1)(i), cmt 17(b)-6.

6.      Because Regulation E prohibits financial institutions from charging any overdraft fees on one-time debit card transactions without first obtaining affirmative consent based on a proper and accurate disclosure of its overdraft practices as presented in a stand-alone opt-in disclosure agreement, Defendant's assessment of overdraft fees on one-time debit card transactions against consumers has been and continues to be illegal.

## PARTIES

7.      Plaintiff is a citizen and resident of Salmon, Lemhi County, Idaho, and has had a checking account with Defendant at all times material hereto.

8.      Defendant is a Credit Union with its headquarters and principal place of business in Idaho Falls, Bonneville County, Idaho. Defendant has more than $700 million in assets. Among other things, Defendant is engaged in the business of providing retail banking services to its customers, including Plaintiff and members of the proposed Class.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim for violation of the Electronic Fund Transfer Act, 15 U.S.C. § 1693, *et. seq*, and Regulation E thereto, 12 C.F.R. part 1005. The Court also has supplemental jurisdiction over Plaintiff's claim for unjust enrichment pursuant to 28 U.S.C. § 1367(a).

10.      This Court has personal jurisdiction over Defendant because it resides in, regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services provided to persons in this District.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District—where Defendant maintains its headquarters.

## BACKGROUND AND FACTUAL ALLEGATIONS

**I.     Defendant Violates the EFTA and Regulation E.**

**A. Regulation E Introduces Rules to Protect Consumers from Predatory Overdraft Fees.**

12.     The EFTA, 15 USC 1693 *et seq*., is intended to protect individual consumers engaging in electronic fund transfers ("EFTs"). EFT services include transfers through automated teller machines ("ATMs"), point-of-sale terminals, automated clearinghouse systems, telephone bill-payment plans in which periodic or recurring transfers are contemplated, and remote banking programs. Prior to December 2011, the Federal Reserve Board was responsible for implementing the EFTA.

13.     The Federal Reserve, having regulatory oversight over financial institutions, recognized that financial institutions had a strong incentive to adopt overdraft programs without giving consumers a choice, since overdraft fees are collected on a nearly risk-free basis. Historically, banks could not decide on overdrafts until after the transaction occurred. Because this entailed a certain amount of risk, financial institutions usually imposed a fee to process the transaction as an overdraft. But as debit card and ATM use rose in popularity, both the number of transactions and the timing of their execution changed. There were more low dollar debit card transactions because debit card use was so convenient, and financial institutions now could either accept or reject transactions at the point of sale. As a result, by simply authorizing these low dollar transactions into overdraft, banks could collect large fees on low dollar transactions that were

almost always quickly repaid. It was a low risk, high reward for the financial institutions while customers suffered the costly effects.

14. And more, these overdraft programs were usually not disclosed to customers, or if so, they were hidden in the middle of a lengthy, boilerplate account agreement. Unlike enrollment in other programs, the customer would be enrolled simply on the word of the banker.

15. The Federal Reserve also noted that "improvements in the disclosures provided to consumers could aid them in understanding the costs associated with overdrawing their accounts and promote better account management." 69 Fed. Reg. 31761 (June 7, 2004).

16. Recognizing that banks and credit unions had strong incentives to adopt these punitive overdraft programs, in 2009, the Federal Reserve Board amended Regulation E to require financial institutions to obtain affirmative consent (or so-called "opt in") from accountholders before the institution could assess OD Fees on ATM and non-recurring "point of sale" debit card transactions. Specifically, Regulation E requires financial institutions to provide consumers with accurate disclosures in understandable language separate from all other information that they could review before they affirmatively consented to enrollment in an overdraft program covering one-time debit card and ATM transactions. Only after a consumer opts-in is the financial institution allowed to assess overdraft fees on these transactions. If a consumer chooses not to opt-in to the financial institution's overdraft service for one-time debit card and ATM transactions, then the financial institution is prohibited from assessing an overdraft fee in connection with any such transaction, regardless of whether payment of the transaction would create an overdraft.

17. Given the state of overdraft programs prior to Regulation E, it is easy to understand why the Federal Reserve was concerned about protecting consumers from financial institutions unilaterally imposing high fees. Banks and credit unions in this scenario had significant advantages

over consumers when it came to imposing overdraft policies. By defaulting to charging fees for point-of-sale transactions, banks and credit unions created for themselves a virtual no-lose scenario—advance small amounts of money for a small period of time, then charge a large fee that is unrelated to the amount of money advanced on behalf of the customer, resulting in a APR of thousands of percent interest, all with almost no risk as only a very small percentage of the overdraft customers failed to repay the overdraft. Moreover, prior to Regulation E, consumers were often automatically enrolled in these punitive overdraft programs.

18.    In July 2011, rulemaking authority under EFTA generally transferred from the Federal Reserve Board to the Consumer Financial Protection Bureau ("CFPB") pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act. The CFPB restated Regulation E at 12 CFR Part 1005 in December 2011.

19.    Like the Federal Reserve, the CFPB recognized that overdraft programs had a series of problems. The most pressing problem was that overdraft services were costly and damaging to accountholders. The CFPB estimated that the banking industry had collected anywhere from $12.6 to $32 billion in consumer NSF and overdraft fees in 2011, depending on what assumptions the analyst used in calculating the percentage of reported fee income should be attributed to overdrafts. The CFPB also noted that there were numerous "variations in overdraft-related practices and policies," all of which could "affect when a transaction might overdraw a consumer's account and whether or not the consumer would be charged a fee."

**B.  Regulation E's Opt-in Requirement**

20.    In response to these issues, the Federal Reserve and CFPB promulgated and restated Regulation E, which requires financial institutions like Defendant to obtain informed consent, by way of a written document that, segregated from all other information, fully and accurately describes the financial institution's overdraft services in an easily understandable way.

If an accountholder does not opt-in to the financial institution's overdraft program, the financial institution must either cover the overdraft without charging a fee or simply decline payment of the transaction at the point of sale. In either scenario, the institution may not charge a fee against the accountholder's account because the accountholder has not consented to participate in the overdraft program.

21.     Regulation E also provides that the opt-in disclosure agreement must satisfy certain requirements to be valid. The agreement must be a stand-alone document "segregated from" other forms, disclosures, or contracts provided by the financial institution. The notice must also accurately disclose to the account holder the institution's overdraft charge policies. The accountholder's choices must be presented in a "clear and readily understandable manner." 12 C.F.R. § 205.4(a)(1).

22.     The financial institution must ultimately establish that the accountholder has opted-in to overdraft coverage either through a written agreement, or through a confirmation letter to the customer confirming opt-in if the opt-in has taken place by telephone or computer after being provided a compliant opt-in disclosure.

23.     Financial institutions are not permitted to circumvent Regulation E's disclosure requirements by reference to reliance on other account agreements, disclosures, or marketing materials. Rather, Regulation E expressly requires a financial institution to include all the relevant terms of its overdraft program within the four corners of the document, creating a separate agreement with accountholders regarding overdraft policies that is "segregated from" the other lengthy and convoluted documents that collectively set the terms of members' accounts. 12 C.F.R. § 1005.17(b)(1)(i).

24.    The EFTA provides a private cause of action for a financial institution's failure to abide by its disclosure requirements.

25.    Moreover, because Regulation E's requirements are incorporated into the EFTA by way of Section 905(a), 15 U.S.C. § 1693c(a), any violation of Regulation E also violates the EFTA, which is privately enforceable under Section 916, 15 U.S.C. § 1693m.

26.    Plaintiff thus seeks restitution of improperly charged OD Fees in violation of Regulation E and the EFTA, plus statutory damages, as appropriate.

**C. Defendant's Processing of Debit Card Transactions**

27.    A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Defendant. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

28.    At this step, if the transaction is approved, Defendant immediately reduces the available balance in a consumer's account and holds funds in the amount of the transaction but does not yet transfer the funds to the merchant.

29.    Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account in a step called "settlement."

30.    Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that Defendant may choose to either pay the transaction or to decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies

industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

31.    Because the account's available balance was reduced to reflect the transaction at authorization, there is no change—no impact whatsoever—to the available balance in an account when the transfer occurs at settlement.

32.    By contrast, the account's actual balance is unaffected by the authorization of debit card transactions and is not reduced to reflect the transaction until the transaction settles.

33.    Multiple days may pass between the authorization and settlement of a debit card transaction.

34.    Accordingly, it is crucial that financial institutions inform their consumers whether overdrafts will be determined at the time the consumer makes (and Defendant authorizes) the transaction or at the time Defendant settles the transactions, which can occur days later.

35.    Put simply, under Regulation E, a financial institution may decide whether it prefers to determine overdrafts at authorization or settlement; however, the financial institution must disclose that information accurately, clearly, and in a way that is easily understood.

36.    Because the Regulation E opt-in disclosure must include this information in a standalone document that is "segregated from" other disclosures and agreements, the opt-in disclosure agreement must inform consumers when Defendant will determine overdrafts (at authorization or settlement) to conform to Regulation E and permit the assessment of OD Fees on one-time debit card and ATM transactions.

37.    Either inaccurately or failing to describe the time an overdraft occurs as part of Defendant's overdraft practice violates the plain language of Regulation E and the EFTA.

38.     Indeed, the CFPB and other federal regulators have found that it is "unfair," "abusive," and "deceptive" to assess overdraft fees on debit card transactions that did not overdraw the account at authorization, particularly where the consumer did not unambiguously agree to the practice.

39.     For example, the CFPB ordered Regions Bank to pay $141 million to reimburse consumers for overdraft fees on debit card transactions authorized on sufficient funds, noting such fees result from "counter-intuitive, complex processes" and finding them to be "unfair" and "abusive" in violation of federal law. Consent Order, *In the Matter of: Regions Bank*, No. 2022-CFPB-0008 ¶¶ 4, 32, 34, 38 (Sept. 28, 2022) (Dkt. 1), https://bit.ly/3vGDdyx.

40.     In December 2022, the CFPB ordered Wells Fargo Bank, N.A. to refund $205 million in such "Authorized-Positive Overdraft Fees" and again declared such practice to be "unfair, deceptive, or abusive" in violation of federal law. Consent Order, *In the Matter of: Wells Fargo Bank, N.A.*, No. 2022-CFPB-0011 ¶¶ 47, 60 (Dec. 20, 2022) (Dkt. 1), https://bit.ly/3ZdnwMM. The CFPB reasoned that "[c]onsumers may be taken by surprise when they incur Authorized-Positive Overdraft Fees because they believed that if they had enough money to cover the relevant transaction when it was authorized they would not incur an Overdraft fee. These Authorized-Positive Overdraft Fees were not reasonable avoidable because they were contrary to consumers' reasonable expectations." *Id.* at ¶ 44.

41.     And in its Winter 2023 Supervisory Highlights, the CFPB again stated this practice is "unfair," as "[c]onsumers could not reasonably avoid the substantial injury, irrespective of account-opening disclosures." *Supervisory Highlights Junk Fees Special Edition*, CONS. FIN. PROTECTION BUREAU 4 (Winter 2023), https://tinyurl.com/3ste5dfr. The CFPB explained that "[w]hile work is ongoing, at this early stage Supervision has already identified at least tens of

millions of dollars of consumer injury and in response to these examination findings, institutions are providing redress to over 170,000 consumers" and indicated the CFPB intends to continue pursuing such "legal violations surrounding [authorized positive, settle negative] overdraft fees both generally and in the context of specific public enforcement actions[, which] will result in hundreds of millions of dollars of redress to consumers." *Id.*

42.     The Federal Reserve has likewise found that OD Fees on debit card transactions authorized on sufficient funds is an "unfair or deceptive" in violation of federal law and advised financial institutions to "[r]efrain from assessing unfair overdraft fees on POS transactions when they post to consumers' accounts with insufficient available funds after having authorized those transactions based on sufficient available funds." *Consumer Compliance Supervision Bulletin: Highlights of Current Issues in Federal Reserve Board Consumer Compliance Supervision*, Fed. Reserve Bd. 12, 13 (July 2018), https://tinyurl.com/44dvnd65.

43.     On April 26, 2023, the Office of the Comptroller of the Currency ("OCC") joined the chorus of regulators, issuing a bulletin to banks addressing the risks associated with overdraft protection programs. The OCC addressed the practices as follows:

> Some banks assess overdraft fees on debit card transactions that authorize when a customer's available balance is positive but that later post to the account when the available balance is negative.
>
> In this scenario, a customer's account has a sufficient available balance to cover a debit card transaction when the transaction is authorized but, due to one or more intervening transactions, has an insufficient available balance to cover the transaction at the time it settles. This is commonly referred to as an APSN transaction. In addition to assessing an overdraft fee on the APSN transaction, some banks also assess an overdraft fee on intervening transactions that exceed the customer's available balance. In this scenario, for example, the bank reduces a customer's available balance by an amount that is more than, equal to, or less than the initial authorized debit card transaction, and subsequently, an intervening transaction further reduces the customer's available balance so that the account no longer has a sufficient available balance. The bank charges an overdraft fee on both the intervening transaction and the initial APSN transaction when posted to the

customer's account.

The OCC has reviewed a number of overdraft protection programs that assess overdraft fees on APSN transactions. In some instances, the OCC has found account materials to be deceptive, for purposes of Section 5, with respect to the banks' overdraft fee practices. In these instances, misleading disclosures contributed to findings that the APSN practice was also unfair for purposes of Section 5. In addition, and based on subsequent analysis, even when disclosures described the circumstances under which consumers may incur overdraft fees, the OCC has found that overdraft fees charged for APSN transactions are unfair for purposes of Section 5 because consumers were still unlikely to be able to reasonably avoid injury and the facts met the other factors for establishing unfairness.

*OCC Bulletin 2023-12: Overdraft Protection Programs: Risk Management Practices*, OFFICE OF COMPTROLLER OF THE CURRENCY (Apr. 26, 2023), https://tinyurl.com/mt63pfnb (footnotes omitted).

### D.  Defendant's Opt-In Form

44.     Defendant's Opt-In Form states:

An overdraft is when you do not have enough money in your account to cover a transaction, but we pay it anyway. We can cover your overdrafts in two different ways:

a.  We have standard overdraft practices called Last Line of Defense that comes with your account, for which you can opt-in below.
b.  We also offer overdraft protection plans referred to as Self Defense, such as a link to your other accounts, which may be less expensive than our standard overdraft practices. For more information, see "Overdraft Protection Plans (Self Defense)" on Page 2.

This notice explains our standard overdraft practices.

### **What are our standard overdraft practices under Last Line of Defense?**

We do authorize and pay overdrafts for the following types of transactions:
 – Checks and other transactions made using your checking account number
 – Automatic bill payments

We do not authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):
 – ATM transactions
 – Everyday debit card transactions

We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction.
If we do not authorize and pay an overdraft, your transaction will be declined.

**What fees will I be charged?**

Under our Last Line of Defense Program:
- We will charge you a fee of up to **$30.00** each time we pay an overdraft.
- We will not charge fees on more than 7 overdrafts per day. After that, we will pay your overdrafts without charging additional fees.

If you do not opt-in to our standard overdraft practices:
- We will charge you an NSF fee of $30.00 each time we reject an item*.

* A particular item may be presented for payment multiple times. You may be charged an NSF fee for each presentment.

**What if I want you to authorize and pay overdrafts?**

If you want us to authorize and pay overdrafts on ATM and everyday debit card transactions, please call…

☐ I want you to authorize and pay overdrafts on my ATM and everyday debit card transactions.

☐ I do not want you to authorize and pay overdrafts on my ATM and everyday debit card transactions. I understand these transactions may be declined by the merchant and I will pay an NSF fee.

Ex. A at 1 (emphasis in original).

45.     In the description above and elsewhere in Defendant's Opt-In Form, Defendant fails to provide a clear and unambiguous description of when its members can expect to be assessed overdraft fees on one-time debit card transactions (at authorization or settlement).

46.     Defendant's Opt-In Form does not accurately represent Defendant's actual fee practices because it does not explain whether overdrafts on debit card transactions are determined at authorization or settlement.

47.     Defendant's failure to identify and explain its overdraft program prevents consumers from affirmatively consenting (or opting in) to the program. Rather, after reviewing,

the Opt-In Form, consumers are left with no understanding as to when Defendant determines overdrafts on debit card transactions.

48.     Defendant's Opt-In Form thus flouts Regulation E's purpose of "protec[ing]… individual consumers engaging in electronic fund transfers, "12 C.F.R. § 1005.1(b), and requiring Defendant to "[p]rovide[] the consumer with a notice in writing,… segregated from all other information, describing the institution's overdraft service" and "[p]rovide[] a reasonable opportunity for the consumer to affirmatively consent, or opt it, to the service." 12 C.F.R. § 1005.17(b)(1)(i)-(ii).

49.     Defendant's Opt-In Form likewise flouts the EFTA's "primary objective," which is the "provision of individual consumer rights." 15 U.S.C. § 1693(b).

50.     Regulation E further provides that the required opt-in notice "must be substantially similar to Model Form A-9 set forth in appendix A of this part. 12 C.F.R. § 1005.17(d).

51.     In direct violation of this requirement, Defendant's Opt-In Form is not "substantially similar to Model Form A-9."

52.     Defendant's Opt-In Form does not comply with Regulation E or the EFTA's requirements to describe or provide notice of Defendant's overdraft practice. Therefore, pursuant to Regulation E and the EFTA, Defendant does not have the authority to assess an OD Fee against Plaintiff or other consumers' accounts as a result of any one-time debit card transaction. 12 C.F.R. § 1005.17(b); 15 U.S.C. § 1693(a).

**E. Defendant charged Plaintiff OD Fees on one-time debit card and ATM transactions even though it used a non-compliant Opt-In Form that precluded Plaintiff from understanding Defendant's overdraft practice or consenting to it.**

53.     Plaintiff enrolled in (opted-in to) Defendant's overdraft protection service with respect to one-time debit card transactions and ATM transactions on November 15, 2024, based on Defendant's non-compliant Opt-In Form. *See* Ex. A. at 1.

54. Defendant charged Plaintiff OD Fees on one-time debit card transactions on numerous occasions.

55. For example, Plaintiff was assessed $30.00 OD Fees on one-time debit card transactions on, *inter alia*, December 1, 2024 (two times); January 5, 2025; January 7, 2025; January 8, 2025; January 9, 2025 (two times); January 10, 2025 (three times); January 11, 2025; January 12, 2025; and January 14, 2025 (three times).

56. Because Defendant's Opt-in Form does not comply with Regulation E or the EFTA, Plaintiff was unable to predict these fees or affirmatively consent (or opt-in) to Defendant's overdraft program. Hence, no OD Fee should have been assessed against her account for these one-time debit card transactions.

**F. None of These Fees Were Errors**

57. The improper fees charged by Defendant to Plaintiff's account were not errors by Defendant, but rather were intentional charges made by Defendant as part of its standard processing of transactions.

58. Plaintiff therefore had no duty to report the fees as errors because they were not; instead, they were part of the systematic and intentional assessment of fees according to Defendant's standard practices.

59. Moreover, any such reporting would have been futile.

## CLASS ALLEGATIONS

60. Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to FRCP 23. The proposed Class is defined as:

> All Defendant checking account holders who, during the applicable statute of limitations, were opted into overdraft protection for one-time debit card transactions and ATM transactions and were assessed overdraft fees on these transactions.

15

Plaintiff reserves the right to modify or amend the definition of the Class as this litigation proceeds.

61. Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

62. This case is properly brought as a class action under Federal Rule of Civil Procedure 23(a) and (b), and all requirements therein are met for the reasons set forth in the following paragraphs.

63. *Numerosity*. The members of the Class are so numerous that separate joinder of each member is impracticable. Upon information and belief, and subject to Class discovery, the Class consists of thousands of members, the identity of whom are within the exclusive knowledge of Defendant and can be ascertained only be resort to Defendant's records. Through the evaluation of Defendant's data, it is possible to identify all members of the Class and the amount of improper fees paid by each Class member. Such specific information is not otherwise available to Plaintiff, but must be maintained pursuant to federal law, and is subject to suitable discovery.

64. *Commonality*. There are numerous questions of law and fact common to the Class relating to Defendant's business practices challenged herein, and those common questions predominate over any questions affecting only individual members of the Class. Among the questions of law and fact common to the Class include:

    a. Whether Defendant's Opt-In Form complied with the Requirements of Regulation E and the EFTA;

    b. Whether Defendant charged OD Fees on non-recurring debit card and ATM transactions without obtaining customers' affirmative consent, in violation of Regulation E and the EFTA;

  c. Whether Defendant was unjustly enriched as a result of these fee assessment practices;

  d. The proper method or methods by which to measure damages; and

  e. The declaratory and injunctive relief to which the Class is entitled.

65. *Typicality*. Plaintiff's claims are typical of the claims of the other Class members in that they arise out of the same wrongful business practices by Defendant, as described herein.

66. *Adequacy of Representation*. Plaintiff is an adequate representative of the Class because Plaintiff has a Defendant checking account and has suffered damages as a result of Defendant's assessment and collection of improper fees. In addition:

  a. Plaintiff is committed to the vigorous prosecution of this action individually and on behalf of all other similarly situated and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions;

  b. There is no hostility of interest between Plaintiff and the unnamed Class members;

  c. Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

  d. Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal work associated with this type of litigation.

67. *Predominance*. The questions of law and fact common to the Class as set forth in the "commonality" allegations above predominate over any individual issues. As such, the "commonality" allegations are restated and incorporated herein by reference.

68. *Superiority*. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual class member's claim is small relative to the complexity of the litigation, no class member could afford to seek

legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Class will continue to suffer losses and Defendant's misconduct will proceed without remedy.

69.     Even if class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows for the consideration of claims which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

70.     Plaintiff and Class members suffer a substantial risk of repeated injury in the future. Plaintiff, like all Class members, is at risk of additional improper fees. Plaintiff and the Class members are entitled to injunctive and declaratory relief as a result of the conduct complained of herein. Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendant from continuing to commit its unfair and illegal actions.

71.     All conditions precedent to bringing this action have been satisfied and/or waived.

**FIRST CLAIM FOR RELIEF**
**Violation of Electronic Fund Transfers Act, 15 U.S.C. § 1693 *et seq*., and**
**Regulation E, 12 C.F.R. § 1005 *et seq*.**
**On Behalf of Plaintiff and the Class**

72.     Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

73.     By charging overdraft fees on one-time debit card transactions without a Regulation E compliant opt-in form, Defendant violates Regulation E, 12 C.F.R. § 1005, *et seq*., the "primary

objective" of which is "the protection of individual consumers," 12 C.F.R. § 1005.1(b), and which "carries out the purposes of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et seq*." 12 C.F.R. § 1005.1(b)).

74.     Specifically, the fees violate what is known as the "Opt-In Rule" of Regulation E. 12 C.F.R. § 1005.17. The Opt-In Rule states: "a financial institution . . . shall not assess a fee or charge . . . pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . describing the institution's overdraft service" and (ii) "[p]rovides a reasonable opportunity for the consumer to affirmatively consent" to enter into the overdraft program. *Id*.

75.     To comply with the notice requirement, the notice "shall be clear and readily understandable," 12 C.F.R. § 1005.4(a)(1), and "segregated from all other information, describing the institution's overdraft service," 12 C.F.R. § 1005.17(b)(1)(i). To assist in preparing such notice, Regulation E identifies the specific information that must be included in the opt-in notice and notes that no other information may be included. 12 C.F.R. § 1005.17(d). Regulation E also provides an exemplar opt-in notice as Model Form A-9 and expressly requires that any opt-in notice utilized by Defendant "shall be substantially similar to Model Form A-9 set forth in appendix A of this part." *Id*.

76.     To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity for the customer to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide

confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17. Furthermore, choosing not to "opt-in" cannot adversely affect any other feature of the account.

77.    The intent and purpose of this opt-in disclosure is to "assist customers in understanding how overdraft services provided by their institutions operate . . . by explaining the institution's overdraft service . . . in a clear and readily understandable way"—as stated in the Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 5940, 5948.  This commentary is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 179 F. Supp. 3d 320, 324 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Regulation Z).

78.    Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a "clear and readily understandable" description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17. Specifically, Defendant's Opt-In Form fails to satisfy 12 C.F.R. § 1005.17 because, *inter alia*, it fails to state when Defendant determines overdrafts on Plaintiff's one-time debit card transactions.

79.    Because Defendant failed to use a Regulation E complaint opt-in disclosure and failed to obtain its customers' affirmative consent as required by Regulation E, Defendant was not legally permitted to assess any overdraft fees on one-time debit card transactions. Plaintiff and members of the Class have been harmed by Defendant's practice of assessing OD Fees on one-time debit card transactions when, under Regulation E, Defendant did not have authority to do so.

80.    The "primary objective" of the EFTA "is the provision of individual consumer rights." 15 U.S.C. § 1693(b).

20

81.     Section 904 of the EFTA states that the CFPB "shall prescribe rules to carry out the purposes of this subchapter." 15 U.S.C. § 1693b(a)(1). The CFPB has prescribed such rules in the form of Regulation E, 12 C.F.R. § 1005, *et seq.*

82.     The EFTA's grant of authority to the CFPB includes the authority to issue model clauses "to facilitate compliance with the disclosure requirements of section 1693c of this title and to aid consumers in understanding the rights and responsibilities of participants in electronic fund transfers by utilizing readily understandable language." 15 U.S.C. § 1693b(b). The CFPB has issued such model clauses in the form of Model Form A-9.

83.     Section 905 of the EFTA requires that "the terms and conditions of electronic fund transfers involving a consumer's account shall be disclosed . . . . in accordance with regulations of the Bureau." 15 U.S.C. § 1693c(a). Such "terms and disclosures" "shall be in readily understandable language" and include information regarding "any charge for electronic fund transfers or for the right to make such transfers." 15 U.S.C. § 1693c(a)(4).

84.     Accordingly, in failing to use a Regulation E-compliant opt-in form, Defendant violated Section 905 of the EFTA by failing to make disclosures "in accordance with regulations of the Bureau."

85.     Plaintiff and members of the Class have been harmed by Defendant's practice of assessing OD Fees on one-time debit card transactions when, under Regulation E and the EFTA, Defendant did not have authority to do so.

86.     As the result of Defendant's violation of Regulation E, 12 C.F.R. § 1005.17, *et seq.*, and the EFTA, 15 U.S.C. § 1693c, Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit, pursuant to 15 U.S.C. § 1693m.

**SECOND CLAIM FOR RELIEF**
**Unjust Enrichment in the Alternative to the First Claim for Relief**
**On Behalf of Plaintiff and the Class**

87.     Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

88.     Plaintiff, individually and on behalf of the Class, asserts a common law claim or unjust enrichment. This claim is brought solely in the alternative to Plaintiff's breach of contract claim and applies only if the parties' contracts are deemed unconscionable or otherwise unenforceable for any reason. In such circumstances, unjust enrichment will dictate that Defendant disgorge all improperly assessed fees.

89.     By means of Defendant's wrongful conduct alleged herein, Defendant knowingly assessed fees upon Plaintiff and the members of the Class that are unfair, unconscionable, and oppressive.

90.     Defendant knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Class. In so doing, Defendant acted with conscious disregard for the rights of Plaintiff and the members of the Class.

91.     As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and the members of the Class.

92.     Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

93.     Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to retain the benefits it received, and is still receiving, without justification, from the imposition of fees on Plaintiff and members of the Class in an unfair, unconscionable, and

22

oppressive manner. Defendant's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

94.    The financial benefits derived by Defendant rightfully belong to Plaintiff and the members of the Class. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the Class all wrongful or inequitable proceeds collected by Defendant. A constructive trust should be imposed upon all wrongful or inequitable sums received by Defendant traceable to Plaintiff and the members of the Class.

95.    Plaintiff and the members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the Class demand a jury trial on all claims so triable and judgment as follows:

a.    Certification of the Class under Rule 23, designation of Plaintiff as Class Representative and designation of the undersigned as Class Counsel;

b.    Restitution of all improper fees paid to Defendant by Plaintiff and the Class because of the wrongs alleged herein in an amount to be determined at trial;

c.    Actual damages in an amount according to proof;

d.    Pre- and post-judgment interest at the maximum rate permitted by applicable law;

e.    Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law;

f.    A declaration that Defendant's fee policies and practices alleged in this Complaint are in violation of Regulation E and the EFTA;

g.    An injunction prohibiting Defendant from continuing to misrepresent its overdraft practices;

23

Case 4:26-cv-00120-BLW   Document 17   Filed 04/13/26   Page 24 of 25

h.  An injunction prohibiting Defendant from continuing to assess fees in violation of Regulation E and the EFTA; and

i.  Granting such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff, by counsel, demands trial by jury.

Dated: April 13, 2026

Respectfully submitted,

*/s/ Martin F. Schubert*
Martin F. Schubert*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
mschubert@stranchlaw.com

Todd Amick, Esq ISB: 5534
**AMICK LAW OFFICES, PLLC**
3367 S. Glen Falls Place
Boise, Idaho 83706
Telephone: (208) 580-4404
Todd@AmickLawOffices.com

Lisa M. La Fornara**
**COHENMALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
llafornara@cohenmalad.com

Christopher D. Jennings**
**JENNINGS & EARLEY PLLC**
500 President Clinton Avenue, Suite 110
Little Rock, Arkansas 72201
chris@jefirm.com

*\* Admitted Pro hac vice*
*\*\* Pro hac vice* application forthcoming

*Attorneys for Plaintiff and the Putative Class*

24

25

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 13th day of April 2026, I caused a true and correct

copy of the foregoing to be served via ECF addressed as follows:

Meredith L. Thielbahr
Mark Bieter
GORDON & REES SCULLY
MANSUKHANI, LLP
999 W. Main Street, #100
Boise, ID 83702
Telephone: (208) 472-5837
Email: mthielbahr@grsm.com
Email: mbieter@grsm.com

*Attorneys for Defendant*
*Frontier Credit Union*

/s/ Martin F. Schubert
Martin F. Schubert*